UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBIN JOHNSON d/b/a CG JOHNSON & COMPANY; JAMES QUINN; FAHMIA, INC.; and PRINZO & ASSOCIATES, LLC, individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>      -v-<br><br>JPMORGAN CHASE BANK, N.A., doing business as CHASE BANK and JPMORGAN CHASE & CO.,<br><br>        Defendants | 20-cv-4100 (JSR) |
| JAMES QUINN, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>      -v-<br><br>SIGNATURE BANK; and DOES 1 through 100,<br><br>        Defendants | 20-cv-4144 (JSR) |
| FAHMIA, INC., individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>      -v-<br><br>MUFG AMERICAS HOLDING CO.; MUFG UNION BANK, N.A.; and DOES 1 through 100,<br><br>        Defendants | 20-cv-4145 (JSR) |

| | |
|---|---|
| FAHMIA, INC., individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>          -v-<br><br>CITIBANK, N.A.; CITIGROUP INC.; and DOES 1 through 100,<br>                    Defendants | 20-cv-4146 (JSR) |
| ROBIN JOHNSON d/b/a CG JOHNSON & COMPANY; JAMES QUINN; FAHMIA, INC.; and PRINZO & ASSOCIATES, LLC, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          -v-<br><br>JPMORGAN CHASE BANK, N.A., doing business as CHASE BANK and JPMORGAN CHASE & CO.,<br>                    Defendants | 20-cv-4858 (JSR) |
| TAX DIVAS, LLC; and WILLIAMS AND J BOOKKEEPING, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          -v-<br><br>J.P. MORGAN CHASE BANK.<br>                    Defendant | 20-cv-5311 (JSR)<br><br><br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.

        Plaintiffs, a collection of accountants and accounting firms, brought these putative class actions arising out of the Paycheck Protection Program ("PPP") created under the

Coronavirus Aid, Relief, and Economic Security Act (the "CARES
Act"). The central legal question presented in this case is
whether the PPP entitles plaintiffs to some portion of the fees
paid by the federal government to the defendant banks that
administered hundreds of billions of dollars of loans under the
PPP, where plaintiffs allegedly assisted borrowers in securing
the loans but had no agreements with the banks entitling them to
payment. On the theory that the PPP and its implementing
regulations automatically entitle them to some portion of these
fees regardless of whether they entered into an agreement with
the banks, plaintiffs filed these six complaints, now
consolidated for all pretrial purposes, seeking declaratory
relief that they are entitled to such funds under the CARES Act
and asserting common law and state law claims largely premised
on the same theory. Defendants, in turn, moved to dismiss all
six complaints.

The Court holds that, absent an agreement between agent and
lender, defendant banks are not required to pay agent fees under
the text of the CARES Act or its implementing regulations.[1] For

---

[1]    This case is one of many pending in district courts around
the country raising the same issue. The only other court to have
ruled on the matter has similarly concluded that the CARES Act
"does not require lenders to pay the agent's fees absent an
agreement to do so. . . ." See Sport & Wheat, CPA, PA v. ServisFirst
Bank, Inc., --- F. Supp. 3d ---, 2020 WL 4882416, at *3 (N.D.
Fla. Aug. 17, 2020).

that reason, among others to be discussed below, the Court grants defendants' motions to dismiss.

I.   Statutory and Factual Background

    A. Statutory Background

The PPP is embedded in an already-existing statutory scheme – the Section 7(a) program of the Small Business Administration (the "SBA"). The Court therefore outlines the Section 7(a) program before delving into the PPP.

    1. The Section 7(a) Program

The SBA administers several programs to support small businesses, including the Section 7(a) loan guaranty program, which is designed to encourage lenders to provide loans to small businesses. Under that program, the SBA guarantees a portion of loans made to small businesses if certain conditions are satisfied. See generally 15 U.S.C. § 636(a).

Under the governing regulations, a small business applying for a Section 7(a) loan may — but is not required to — use an "agent" for assistance with the application process. 13 C.F.R. § 103.2.[2] An "agent" is defined as an "authorized representative, including an attorney, accountant, consultant, packager, lender

---

[2]     In fact, most Section 7(a) loans are made without the assistance of an agent. See 85 Fed. Reg. 7,622, 7,627 (Feb. 10, 2020) ("Over the course of five fiscal years (FY2013–FY2017), only 2.78 percent of total approved 7(a) loans reported utilizing an Agent (other than the participating Lender) to provide assistance to an Applicant for a fee.").

service provider, or any other individual or entity representing an Applicant or Participant by conducting business with SBA." Id. § 103.1. These agents can be empowered to prepare or submit the application on behalf of the applicant. Id. § 103.1(a), (b).

When a small business chooses to use an agent, the SBA and its accompanying regulations set out a comprehensive scheme regulating how and how much an agent is to be paid. First, the statute makes clear that "[n]o loan shall be made" unless the applicant "certif[ies] to the Administration the names of any attorneys, agents, or other persons engaged by or on behalf of such [applicant] for the purpose of expediting applications made to the Administration for assistance of any sort, and the fees paid or to be paid to any such persons." 15 U.S.C. § 642. The governing regulations, in turn, clarify that an agent "must execute and provide to SBA a compensation agreement," which "governs the compensation charged for services rendered or to be rendered to the Applicant or lender in any matter involving SBA assistance." 13 C.F.R. § 103.5(a).

The SBA "provides the form of compensation agreement . . . to be used by Agents." Id. That form is called a Form 159 Fee Disclosure and Compensation Agreement. See 20-cv-4100, Dkt. No. 55-1 ("Form 159"). The Form 159 must "be completed and signed by the SBA Lender and the Applicant whenever an Agent is paid by either the Applicant or the SBA Lender in connection with the

5

SBA loan application." Form 159 at 1. In addition, the "Agent must be identified, all services provided must be listed, and the party paying the fee and amount paid must also be disclosed." Id.

The governing regulations also impose limits on how much an agent can be paid:

> Total compensation charged by an Agent or Agents to an Applicant for services rendered in connection with obtaining an SBA-guaranteed loan must be reasonable. . . . SBA considers the following amounts to be reasonable for the total compensation that an Applicant can be charged by one or more Agents:
>
> (1) For loans up to and including $500,000: A maximum of 3.5 percent of the loan amount, or $10,000, whichever is less;
>
> (2) For loans $500,001-$1,000,000: A maximum of 2 percent of the loan amount, or $15,000, whichever is less; and
>
> (3) For loans over $1,000,000: A maximum of 1.5 percent of the loan amount, or $30,000, whichever is less.

13 C.F.R. § 103(5)(b).

## 2. The CARES Act and the PPP

On March 27, 2020, in response to coronavirus pandemic, Congress passed the CARES Act to "provide emergency assistance and health care response for individuals, families, and businesses affected by the . . . pandemic." Amounting to approximately $2 trillion, the CARES Act is the largest single economic stimulus bill in American history. See Second Amended

Class Action Complaint ("Quinn Compl."), 20-cv-4100, Dkt. No.

43, ¶ 20. Among other things, the CARES Act created the Paycheck

Protection Program (the "PPP"), a $659 billion forgivable loan

program for eligible small businesses. Id. ¶ 21.

PPP loans are "guarantee[d]" by the SBA "under the same

terms, conditions, and processes as a loan made under" the

above-described Section 7(a) loan program, "except as otherwise

provided in this paragraph." 15 U.S.C. § 636(a)(36)(B). One

notable difference is that the PPP, unlike the Section 7(a)

program, provides that lenders "shall" receive from the federal

government a specified percentage of the loans they originate:

> The Administrator shall reimburse a lender authorized
> to make a covered loan at a rate, based on the balance
> of the financing outstanding at the time of
> disbursement of the covered loan, of—
>
> (I)     5 percent for loans of not more than
>         $350,000;
>
> (II)    3 percent for loans of more than $350,000
>         and less than $2,000,000; and
>
> (III)   1 percent for loans of not less than
>         $2,000,000.

Id. § 636(a)(36)(P)(i). With respect to agent fees, the PPP

further provides:

> **(ii) Fee limits**
>
> An agent that assists an eligible recipient to prepare
> an application for a covered loan may not collect a
> fee in excess of the limits established by the
> Administrator.

Id. § 636(a)(36)(P)(ii).

    The PPP implementing regulations provide more details on loan applications and agent compensation. The regulations first clarify that the "program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement." SBA Interim Final Rule, 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020). The regulations then restate that the "SBA will pay lenders fees for processing PPP loans" in the amounts specified in the statute. Id.

    Next, the regulations address agent fees:

**c. Who pays the fee to an agent who assists a borrower?**

Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

i.    One (1) percent for loans of not more than $350,000;

ii.   0.50 percent for loans of more than $350,000 and less than $2 million; and

iii. 0.25 percent for loans of at least $2 million.

The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans.

Id.[3] Thus, the regulations modify the ordinary Section 7(a)
procedures by restricting from whom the agents could
receive fees (only lenders, not applicants) and by limiting
the amount they could receive (capped at a specified
percentage of the loan). The regulations also modify
certain other aspects of the Section 7(a) loan program,
such as allowing lenders to "rely on certifications of the
borrower" to determine eligibility. Id. at 20812.

B. Factual Background[4]

Plaintiffs are accountants and accounting firms that
allegedly assisted clients in applying for and obtaining PPP
loans.[5] Their work included advising clients on the eligibility
requirements for PPP loans, calculating the requisite payroll

---

[3]   An information sheet put out by the SBA contains
substantially similar information. See 20-cv-4100, Dkt. No. 62-
2.

[4]   The Court draws the following facts from the six
complaints. See Quinn Compl.; 20-cv-4144, Dkt. No. 15
("Signature Compl."); 20-cv-4145, Dkt. No. 1 (the "Union
Compl."); 20-cv-4146, Dkt. No. 1 ("Citi Compl."); 20-cv-4858,
Dkt. No. 17 ("Johnson Compl."); 20-cv-5311, Dkt. No. 1 ("Tax
Divas Compl."). For the purposes of this instant motion, the
well-pleaded allegations in the complaints are assumed to be
true.

[5]   Across the six consolidated cases, plaintiffs are: Robin
Johnson (20-cv-4100, 4858); James Quinn (20-cv-4100, 4144,
4858); Fahmia, Inc. ("Fahmia") (20-cv-4100, 4145, 4146, 4858);
Prinzo & Associates, LLC ("Prinzo") (20-cv-4100, 4858); Tax
Divas, LLC ("Tax Divas") (20-cv-5311); and Williams and J
Bookkeeping ("Williams") (20-cv-5311).

information, reviewing the applications before filing, and
providing documentation in support of the application. See,
e.g., Quinn Compl. ¶ 34. Defendants are banks that processed
these PPP loan applications and were reimbursed under the terms
of the PPP.[6]

Plaintiffs brought these six putative class-action
complaints, which have been consolidated for all pretrial
purposes, alleging that the PPP requires the defendant banks to
provide them with a portion of the resulting compensation the
defendants received for processing their clients' loan
applications. Plaintiffs seek anywhere between $78 and $8,607.37
for their efforts.[7] Plaintiffs also allege that certain defendant
banks represented in various ways that they would pay agents.
Id. ¶ 29.

---

[6]    Across the six consolidated cases, defendants include:
JPMorgan Chase Bank, N.A. and JPMorgan Chase & Co. (collectively
"Chase") (20-cv-4100, 4858, 5311), CitiBank, N.A. and CitiGroup
Inc. (collectively "Citi") (20-cv-4146), Signature Bank
("Signature") (20-cv-4144), and MUFG Americas Holding Co. and
MUFG Union Bank, N.A. (collectively "Union") (20-cv-4145).

[7]    Specifically, Quinn seeks $8,607.37 from Chase and
$2,740.90 from Signature; Fahmia seeks $1,118.15 from Chase,
$289 from Citi, and $78 from Union; Johnson seek $255.58 from
Chase; Prinzo seeks $450.97 from Chase; Tax Divas seeks $2,000
from Chase; and Williams seeks $674 from Chase. See Quinn Compl.
¶¶ 36, 44, 55, 63; Signature Compl. ¶ 53; Union Compl. ¶ 47;
Citi Compl. ¶ 47; Tax Divas Compl. ¶¶ 65, 74.

Crucially, plaintiffs do not allege that they entered into an agreement with defendant banks regarding agent fees. Rather, they allege that, regardless of any agreement between the parties, the PPP and its implementing regulations independently require that lenders share some portion of their fees with agents. In addition, some, but not all, plaintiffs allege that they requested that the defendant banks pay them these agent fees.

Between May and July 2020, plaintiffs filed these complaints seeking declaratory relief that they are entitled to a share of the lenders' fees under the CARES Act and asserting a combination of common law and state law claims largely premised on the same theory. Defendants moved to dismiss. After full briefing and oral argument, the motions are now ripe for decision.

II.  Legal Analysis

Defendants make numerous arguments in support of their motions to dismiss. First, as a constitutional threshold, the Court must address defendants' argument that the Court lacks subject matter jurisdiction over the claims of those plaintiffs who have never even requested an agent fee. Second, defendants argue that plaintiffs' claims for declaratory judgment under the CARES Act fail — either because the PPP does not entitle agents to fees in the absence of an agreement between an agent and a

lender or because plaintiffs cannot seek declaratory judgment
under the CARES Act since it lacks a private cause of action.
Finally, defendants argue that the remaining state law and
common law claims all fail — either because they are predicated
on plaintiffs' reading of the PPP or for various independent
reasons. The Court addresses each of these arguments in turn.[8]

A. Subject Matter Jurisdiction

"In resolving a motion to dismiss under Rule 12(b)(1), the
district court must take all uncontroverted facts in the
complaint . . . as true, and draw all reasonable inferences in
favor of the party asserting jurisdiction." Tandon v. Captain's
Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir.
2014).[9] To survive a motion to dismiss for lack of subject matter
jurisdiction, a plaintiff "must allege facts that affirmatively
and plausibly suggest that it has standing to sue." Carter v.
HealthPort Tech. LLC, 822 F.3d 47, 57 (2d Cir. 2016)

---

[8]    Because, as discussed below, the Court dismisses all of
plaintiffs' claims either for lack of subject matter
jurisdiction or on the merits, the Court declines to reach (1)
defendants' argument that claims against the holding company
defendants should be independently dismissed, and (2)
defendants' argument that the state law claims fail because they
are predicated on the violation of a statute — the CARES Act —
that does not allow for private enforcement.

[9]    Unless otherwise indicated, in quoting cases all internal
quotation marks, alterations, emphases, footnotes, and citations
are omitted.

Defendants move to dismiss the claims brought by certain plaintiffs who, defendants argue, lack standing because they have not alleged that they requested from the defendants, and were denied, agent fees. See Memorandum of Law in Support of Defendants' Joint Motion to Dismiss for Failure to State a Claim and Lack of Subject-Matter Jurisdiction ("Defs' Mem."), 20-cv-4100, Dkt. No. 54, at 29; Memorandum of Law in Support of Defendants MUFG Americas Holding Co. and MUFG Union Bank, N.A.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Union Supp."), 20-cv-4145, Dkt. No. 32, at 1; Supplemental Memorandum of Law in Support of Defendants' Joint Motion to Dismiss by Defendants JPMorgan Chase Bank, N.A. and CitiBank, N.A. ("Chase & Citi Supp."), 20-cv-5311, Dkt. No. 29, at 7.[10] "As a general matter, to establish standing to challenge an allegedly [illegal] policy, a plaintiff must submit to the challenged policy." Jackson-Bey v. Hanslmaier, 115 F.3d 1091,

---

[10]   While defendants invoke both constitutional ripeness and standing, the two issues "boil down to the same question in this case." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128 n. 8 (2007); see also New York v. Trump, No. 20-cv-5770 (RCW) (PWH) (JMF), 2020 WL 5422959, at *9 (S.D.N.Y. Sept. 10, 2020) (three judge panel) ("Where . . . the question is whether a plaintiff's injury is sufficiently real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing."). Therefore, the Court "address[es] them together under the single umbrella term of 'standing.'" New York, 2020 WL 5422959, at *9.

1096 (2d Cir. 1997); see also United States v. Decastro, 682
F.3d 160, 164 (2d Cir. 2012).

    Plaintiffs do not contest that certain of them have failed
to make any request for agent fees. Instead, plaintiffs argue
that the defendants have each adopted a company-wide policy of
not paying agent fees, thus rendering any such request futile.
Plaintiffs' Opposition to Defendants' Motion to Dismiss for
Failure to State a Claim and Lack of Subject-Matter Jurisdiction
("Pls' Mem."), 20-cv-4100, Dkt. No. 61, at 34. It is well-
established that the requirement that a plaintiff have submitted
to a policy before challenging it may be excused "where a
plaintiff makes a substantial showing that application for the
benefit . . . would have been futile." Jackson-Bey, 115 F.3d at
1091. Courts have found futility where the defendant
"articulated a very clear position on the issue which it has
demonstrated it would be unwilling to reconsider." See, e.g.,
U.S./Fed. Commc'ns Comm'n v. Cuevas, No. 3:99CV1261 CFD, 2000 WL
852308, at *6 (D. Conn. Mar. 31, 2000); Cf. Randolph-Sheppard
Vendors of America v. Weinberger, 795 F.2d 90, 106 (D.C. Cir.
1986) ("When an agency has committed itself not to change its
rules unless judicially compelled to do so, has made known that
its general views are contrary to those of the complainant, and
has never given an inkling that it would consider a matter

afresh . . . a complainant need not make a pro forma request
that the agency redo its system.").[11]

### 1. Claims Against Chase and Signature

With respect to Chase and Signature, plaintiffs have
sufficiently alleged futility. Plaintiffs allege, and neither
Chase nor Signature disputes, that senior officials at each bank
informed at least one plaintiff that the bank does not pay agent
fees as a matter of course. See Quinn Compl. ¶ 46 (alleging that
a vice president informed Quinn that "Chase Bank does not pay
fees"); Signature Compl. ¶ 39 (alleging that a senior vice
president informed Quinn that Signature does not pay agent fees
in the absence of an agreement). On this basis, the Court finds
that requests for fees to Chase and Signature would have been
futile and therefore holds that it has subject matter
jurisdiction over the claims against these defendants.

### 2. Claims Against Citi and Union

The matter is less clear-cut with respect to Citi and
Union. Unlike with Chase and Signature, plaintiff Fahmia (the
only plaintiff who has brought claims against Citi and Union)[12]

---

[11]   As these citations suggest, courts typically advert to this
form of futility in the context of agency action and
administrative exhaustion. But the reasoning applies all the
same where, as here, a corporate defendant has clearly adopted a
formal position on the contested issue.

[12]   Tax Divas had initially brought claims against Citi but has
since voluntarily dismissed them. See 20-cv-5311, Dkt. No. 31.

has offered nothing more than conclusory allegations that a request would be denied. See, e.g., Citi Compl. ¶ 37 ("Defendants are refusing to pay the fees of agents for their assistance in providing an accurate and truthful application for funding."); Fahmia Compl. ¶ 37 (same). Even drawing all reasonable inferences in favor of Fahmia, "it is not clear on the face of the complaint whether requesting [agent fees] is a futile gesture." Ciaramella v. Zucker, 18-cv-6945 (JPO), 2019 WL 4805553, at *6 (S.D.N.Y. Sept. 30, 2019). Thus, Fahmia's claims against Citi and Union must be dismissed for lack of subject matter jurisdiction.[13]

---

[13]   What is more, Union (but not Citi) has adduced considerable evidence that it has no such policy against paying agent fees. To the contrary, it has a policy "to pay the maximum fees allowable under the [regulations] to agents that assist with PPP loans even if the fee request was not made prior to loan funding – so long as a Form 159 Compensation Agreement is completed." Union Supp. at 7. In response, Fahmia insists that a request for fees would still be futile because, as discussed below, it does not believe that a Form 159 agreement is required under the PPP and it should not be required to submit such a form in order to have standing to challenge Union's policy. See Plaintiff Fahmia, Inc's Opposition to MUFG Americas Holding Co. and MUFG Union Bank, N.A. Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Fahmia Supp."), Dkt. No. 44, at 1. Ultimately, however, this issue is beside the point. The Court holds that Fahmia lacks standing to sue Union simply because Fahmia has not offered anything more than conclusory allegations of a policy to deny agent fees. The Court therefore need not reach the further question whether Union's alleged policy of paying only those agents who submit a Form 159 would excuse as a futile Fahmia's obligation to make some request for agent fees without such a form.

B. <u>Declaratory Judgment Under the CARES Act</u>

Having addressed subject matter jurisdiction, the Court now turns to the crux of this case — namely, whether plaintiffs have adequately alleged that defendants have violated the PPP. Specifically, plaintiffs seek a declaration that defendants are required to pay agent fees to plaintiffs for the work they performed on behalf of borrowers who obtained PPP loans from defendants, even in the absence of an express agreement to that effect.

Defendants move to dismiss these claims on two separate grounds. First, on the merits, they argue that the CARES Act does not entitle agents to fees from lenders; and, second, even if it did, they argue that there is no private right of action to enforce the CARES Act. The Court agrees in both respects and therefore dismisses all declaratory judgment claims.

1. <u>Whether the CARES Act Entitles Agents to Fees</u>

Plaintiffs seek a declaration that defendants "are obligated to pay agents — within the SBA-approved limits - for the work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan," regardless whether the lender and the agent entered into any agreement concerning such fees. Quinn Compl. ¶ 78. In other words, plaintiffs argue that the PPP and its implementing regulations automatically entitle any agent

17

who assists borrowers in connection with a PPP loan to some portion of the fees that the federal government pays to the lender.[14]

As discussed above, however, under longstanding SBA regulations, agents are only entitled to receive fees for their work in connection with securing a loan where they first execute a "compensation agreement" signed by the lender, agent, and applicant. Defs' Mem. at 1. And the PPP provides that PPP loans are "guaranteed" by the SBA "under the same terms, conditions, and processes as a loan made under" the Section 7(a) loan program, "except as otherwise provided in this paragraph." 15 U.S.C. § 636(a)(36)(B). The implementing regulations, in turn, provide that the "program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement." 85 Fed. Reg. at 20816. Accordingly, the provisions of the Section 7(a) program that do not conflict with the PPP continue to apply. The question, then, is whether the SBA

---

[14]    At the outset, the Court notes that plaintiffs have failed to offer a consistent theory of what portion of the lenders' fees they believe they are entitled to. While plaintiffs allege in their complaints that they are entitled to the maximum amount permitted under the regulations, plaintiffs' counsel at oral argument suggested that "a process by which agents submit details and an amount is arrived at" would also be permissible. See Transcript of Oral Argument dated August 21, 2020 at 27:19-28:7. That plaintiffs cannot even extract a definite theory of how much they are owed under the statute is itself an indication that the statute does not automatically entitle them to any portion of the fees.

requirement of a preexisting agreement between lender and agent applies to loans made under the PPP.[15]

Plaintiffs argue that Section 7(a)'s requirement of a compensation agreement as a prerequisite for agent fees conflicts with several features of the PPP program and therefore does not apply.

Plaintiffs first suggest that the language of the PPP "provides for agents to receive fees for assisting borrowers with PPP applications. . . ." Pls' Mem. at 7. As discussed above, the PPP's only mention of agent fees provides that "[a]n agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator." 15 U.S.C. § 636(a)(36)(P)(ii). The Court finds that that language does not create an independent entitlement for agent fees; rather, it simply imposes a limit on the amount of fees an agent is permitted to collect in the event of an agreement for agent fees. Such a reading is bolstered by the fact that when Congress

---

[15]    Plaintiffs suggest that § 636(a)(36)(B) could be read to refer only to how loans are "guaranteed" under the PPP, "not to how the SBA does anything else, including paying fees to lenders or agents." Pls' Mem. at 9. Even if the Court were inclined to adopt such a cabined reading of the provision, the regulations independently provide that "program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement," suggesting, as just discussed, that any non-conflicting regulations remain in force.

wanted to compensate parties involved in processing PPP loan applications, as is the case with lenders, it did so explicitly. See id. § 636(a)(36)(P)(i) ("The Administrator shall reimburse a lender authorized to make a covered loan . . . ."). Indeed, if Congress had intended for agents to automatically receive a portion of the lenders' fees, it would have said so. Cf. Keene Corp. v. United States, 508 U.S. 200, 208 (1993) ("When Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Plaintiffs fare no better when they turn to the implementing regulations. Like the statutory text, those regulations impose limits on agent fees, specifying how much and from whom the agents could collect fees. Again, they do not entitle agents to fees but simply regulate how such fees would be paid when they are to be paid. Nothing in these regulations, then, is inconsistent with the Section 7(a) requirement that an agent must first execute an agreement before receiving any agent fees.[16]

---

[16]   Plaintiffs suggest that the Form 159 - the specified compensation agreement form used in connection with the Section 7(a) program - is "inapplicable on its face" because the form provides that it "must be completed and signed by the SBA Lender and the Applicant whenever an Agent is paid by either the Applicant or the SBA Lender in connection with the SBA Loan" but

Finally, plaintiffs offer several broadly purposivist arguments for why the Section 7(a) requirement of a preexisting agreement between lenders and agents is "inconsistent with the PPP's basic function" and therefore has been superseded. Specifically, plaintiffs stress that the PPP was "an emergency program in which everyone . . . was expected to and did act with incredible alacrity in saving businesses and jobs." Pls' Mem. at 11. It is therefore "inconceivable," according to plaintiffs, that Congress and the SBA would have required agents to complete a compensation agreement before assisting their clients. Id. at 12. But considering that only a small fraction of loan applicants typically make use of an agent and that the SBA itself estimates that it would take no longer than eight minutes to complete a PPP application, see 20-cv-4100, Dkt. No. 55-2, at 3; 85 Fed. Reg. at 7,627, the Court does not see how requiring agents to reach an agreement with lenders before receiving a share of their fees would "irredeemably compromise[] the PPP's mission," Pls' Mem. at 8.

---

under the PPP, agents cannot be paid by the applicant. Pls' Mem. at 10. This argument is unpersuasive for two reasons. First, as the just-quoted language makes clear, the form must also be completed when an agent is paid by the lender – precisely what the PPP contemplates. Second, even if plaintiffs were correct that this particular form is inapplicable to the PPP, that would not itself dispose of the requirement that agents and lenders enter into an agreement in order for agents to receive fees.

Plaintiffs also contend that requiring the parties to reach an agreement would make "no practical sense" because there would be no reason for a lender to agree to pay agent fees out of its own pocket. Id. at 12. But this argument undermines the plaintiffs' theory of the case, which is that the agents are conferring a service upon lenders by streamlining the application process and thereby enabling lenders to make loans more efficiently. To the extent there is value in that proposition, it is not unreasonable to imagine that lenders would pay agents for that service.

Most dramatically, plaintiffs suggest that if they are not entitled to a share of the lenders' fees, then either: "(1) borrowers would be prohibited from using agents to assist them with PPP applications or (2) agents would be required to work for free" – either of which, according to plaintiffs, would be "absurd." Id. at 7. As defendants point out, however, plaintiffs are overlooking a third option: comply with the standard process and reach an agreement with the lender. Reply Memorandum in Further Support of Defendants' Joint Motion to Dismiss for Failure to State a Claim and Lack of Subject-Matter Jurisdiction ("Reply"), 20-cv-4100, Dkt. No. 65, at 5.

Accordingly, the Court holds that, absent an agreement between agent and lender, lenders are not required to pay agent fees under the text of the CARES Act or its implementing

22

regulations. And because plaintiffs do not allege that they entered into any agreement with defendants regarding agent fees, the Court holds that they are not entitled to any such fees. Their claims for declaratory relief must therefore be dismissed.

>    2. <u>Whether There is a Private Cause of Action to Enforce the CARES Act</u>

Even if plaintiffs had a viable argument on the merits (which they do not), the Court would dismiss their declaratory judgment claims for an independent reason: there is no private cause of action to enforce this provision of the CARES Act.

The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The operation of the Declaratory Judgment Act is "procedural only," however, and "does not create an independent cause of action." <u>Chevron Corp. v. Naranjo</u>, 667 F.3d 232, 244-45 (2d Cir. 2012). Accordingly, plaintiffs may only seek declaratory judgment under the CARES Act if there is a private cause of action under that statute.

The CARES Act does not contain an express cause of action to enforce the PPP. Whether there exists an implied cause of action turns on whether there is "a clear manifestation of congressional intent to create" one. <u>Lopez v. Jet Blue Airways</u>, 662 F.3d 593, 596 (2d Cir. 2011). Such a "clear manifestation"

exists where the statute's text and structure show an intention to create a federal right through rights-creating language, an intention to create a private remedy, and consistency of a private remedy with the statutory scheme. See Rep. of Iraq v. ABB AG, 768 F.3d 145, 170 (2d Cir. 2014).

Here, plaintiffs do not even argue that there exists an implied cause of action under the CARES Act. For good reason. There is no language in the CARES Act that suggests Congress intended for agents — who are not even the intended beneficiary of a statute that is designed to get money in the hands of small businesses — to have a private remedy. Indeed, as discussed above, far from creating rights for agents, the CARES Act imposes additional restrictions on the agents, prohibiting them from collecting fees above certain amounts and from applicants.

Plaintiffs suggest, however, that because they bring state law claims that are predicated on their interpretation of the CARES Act, they may seek a declaration of their rights under that statute. Pls. Br. at 35. But plaintiffs do not cite any relevant case law to support such a proposition.[17] The Court therefore holds, in the alternative, that plaintiffs'

---

[17]   The only case cited by plaintiffs is In re Joint E. & S. Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993). That case, which simply dismissed a declaratory judgment action for lack of subject matter jurisdiction, has no relevance to the issue here presented.

declaratory judgment claims must be dismissed because plaintiffs
have failed to identify an underlying substantive cause of
action.

       C. <u>Remaining State Law Claims</u>

     Finally, plaintiffs bring various state law claims, almost
all of which are predicated on plaintiffs' theory that the PPP
entitles them to a portion of the lenders' fees. Largely because
the PPP does not entitle plaintiffs to any portion of the
lenders' fees (absent an agreement), each of these state law
claims fails and must be dismissed.[18]

       1. <u>Common Law Claims</u>

         a. <u>Breach of Contract Claims</u>

     In the absence of a private cause of action to enforce the
CARES Act, Johnson, Quinn, Fahmia, and Prinzo maintain that they
can enforce either the agreement between defendants and the SBA
or the agreement between defendants and borrowers as third-party
beneficiaries. <u>See</u>, <u>e.g.</u>, Quinn Compl. ¶¶ 79-85 (breach of
contract between defendants and the SBA); <u>id.</u> ¶¶ 86-91 (breach
of contract between defendants and borrowers). Specifically,

_____

[18]   As suggested above, the parties dispute whether the lack of
a private cause of action under the CARES Act precludes state
law claims, like the ones brought in this case, that are based
in whole or in part on substantive rights putatively created
under that statute. Because the Court holds that these state law
claims fail on the merits, however, the Court does not reach
this issue.

these plaintiffs allege that defendants entered into agreements
with the SBA and borrowers pursuant to which defendants agreed
to adhere to all PPP rules and regulations and incorporated
those requirements by reference. See, e.g., id ¶¶ 80-81.
However, because the Court holds that the PPP rules and
regulations do not entitle plaintiffs to agent fees, the Court
rejects these breach of contract claims.[19]

### b. Unjust Enrichment

All plaintiffs bring claims for unjust enrichment. To state
a claim for unjust enrichment under New York law,[20] plaintiffs
must allege that: (1) defendant was enriched; (2) at plaintiff's
expense; and (3) equity and good conscience militate against
permitting defendant to retain what plaintiff is seeking to
recover. Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,
631 F.3d 42, 55 (2d Cir. 2011).

---

[19]    Even if the PPP entitled plaintiffs to agent fees, the
breach of contract claims would be foreclosed by controlling
precedent that forbids third-party suits to enforce agreements
that merely incorporate obligations under a statute that does
not itself permit the third-party to enforce it. See Astra USA,
Inc. v. Santa Clara County, Cal., 563 U.S. 110, 118 (2011).
Plaintiffs attempt to cabin Astra to its facts, but nothing in
that case suggests such a narrow scope.

[20]    While Johnson is a California citizen, both parties
recognize that California law requires similar elements. Defs'
Mem. at 21 n. 13; Pls' Mem. at 18 n.18. In addition, Tax Divas
is a Nevada citizen and Williams is a Texas citizen, but, as
defendants point out, Nevada and Texas law also have similar
requirements. See Chase & Citi Supp. at 1 n.4.

Plaintiffs argue that equity and good conscience support
their claim because "defendants received handsome payments for
issuing no-risk loans, a portion of which payment was
specifically allocated for agents" and it is "unjust that they
refuse to pay plaintiffs' portion of the fees." Pls' Mem. at 19-
20; see also Quinn Compl. ¶ 111 ("Defendants have obtained
millions of dollars in benefits in the form of PPP loan
origination fees. A portion of those fees were to be paid to
agents, including Plaintiffs, who assisted in their clients' PPP
loan applications. But Defendants are refusing to pay those
fees, in contravention of PPP regulations and to the detriment
of Plaintiffs and the Class."). However, because the Court holds
that the PPP rules and regulations do not entitle plaintiffs to
agent fees, the Court rejects these unjust enrichment claims.[21]

### c. Conversion

All plaintiffs bring claims for conversion. Under New York
law,[22] "[c]onversion is the unauthorized assumption and exercise

---

[21]   Defendants also argue that the unjust enrichment claims
independently fail because plaintiffs have not sufficiently
alleged that they conferred a "specific" and "direct" benefit on
defendants, which defendants contend is an element of an unjust
enrichment claim. Defs' Mem. at 21. Because the Court dismisses
the unjust enrichment claims on other grounds, it does not reach
this issue.

[22]   With respect to Johnson, defendants suggest that
California law imposes an additional requirement that Johnson
must identify specific funds that are being withheld. Defs' Mem.
at 23 n.14. Because the Court holds that Johnson cannot make out

of the right of ownership over goods belonging to another to the
exclusion of the owner's rights." Thyroff v. Nationwide Mut.
Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006). Plaintiffs allege
that they "have a right to agent fees that must be paid from the
amount of lender fees provided to Defendants for processing the
funded PPP loan applications of Plaintiffs' clients . . . ."
Quinn Compl. ¶ 103. However, once again, because the Court holds
that the PPP rules and regulations do not entitle plaintiffs to
agent fees, the Court rejects these conversion claims.[23]

### d. Misappropriation

Johnson, Quinn, Fahmia, and Prinzo bring misappropriation
claims against Chase. Under New York law,[24] misappropriation is
an "amorphous cause of action" that "has been broadly described
as encompassing any form of commercial immorality, or simply as
endeavoring to reap where one has not sown; it is taking the

---

the basic elements of a conversion claim, however, the Court
does not reach this issue.

[23]   Defendants also argue that the conversion claims
independently fail because plaintiffs do not sufficiently allege
that they had prior ownership, possession, or control of the
money, which defendants contend is an element of a conversion
claim under New York law. Defs' Mem. at 23-25. Because the Court
dismisses the conversion claims on other grounds, it does not
reach this issue.

[24]   The parties assume that New York law controls these claims,
see Defs' Mem. at 24; Pls' Mem. at 21, "and such implied consent
. . . is sufficient to establish choice of law." Chau v. Lewis,
771 F.3d 118, 126 (2d Cir. 2014).

skill, expenditures and labors of a competitor and

misappropriating for the commercial advantage of one person a

benefit or property right belonging to another." Mobileye v.

Picitup Corp., 928 F. Supp. 2d 759, 783 (S.D.N.Y. 2013) (quoting

Standard & Poor's Corp., Inc. v. Commodity Exch., Inc., 683 F.2d

704, 710 (2d Cir. 1982). "While this tort is adaptable and

capacious, it does require a showing of bad faith." Id.

    Here, plaintiffs allege in a conclusory fashion that

"[a]cting in bad faith, Defendants have refused to pay

Plaintiffs . . . their statutorily mandated fees." Quinn Compl.

¶ 117. However, because the Court holds that plaintiffs are not

statutorily entitled to the agent fees, the Court rejects these

misappropriation claims.[25]

### e. Money Had and Received

    Tax Divas and Williams bring claims for money had and

received against Chase. Under New York law,[26] "an action for

money had and received lies when (1) defendant received money

---

[25]    Defendants also argue that the misappropriation claims
independently fail because plaintiffs have not adequately
alleged that Chase acted as plaintiffs' competitor and because
plaintiffs have not adequately alleged "bad faith," which they
contend are also elements of a misappropriation claim. Defs'
Mem. at 24. Because the Court dismisses the misappropriation
claims on other grounds, it does not reach these issues.

[26]    The parties assume that New York law controls these claims,
see Chase & Citi Supp. at 7 n.7; Pls' Mem. at 22, "and such
implied consent . . . is sufficient to establish choice of
law." Chau, 771 F.3d at 126.

belonging to plaintiff; and (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." Fischer v. Graham, No. 15-CV-6414 (NSR), 2016 WL 3181157, at *12 (S.D.N.Y. June 3, 2016). This cause of action is "is essentially identical to a claim of unjust enrichment." Belda v. Doerfler, No. 14-cv-941 (AJN), 2015 WL 5737320, at *4 n.4 (S.D.N.Y. Sept. 30, 2015) (collecting cases).

These plaintiffs allege that they "assisted their clients with applications for PPP loans that were subsequently funded. Due to Plaintiffs' and the Class Members' efforts, their clients were awarded PPP loans through applications to one or more of the Defendants. As such, Plaintiffs and the Class Members have a right to immediate possession of Agent Fees to be paid by whichever Defendant funded their clients' loan(s)." Tax Divas Compl. ¶ 116. However, for the same reasons the Court denies plaintiffs' unjust enrichment claims, it likewise rejects these money had and received claims.

### 2. Statutory Claims

Unlike the common law claims, which are expressly predicated on plaintiff's interpretation of the PPP, plaintiffs allege that certain defendants misrepresented in various ways

that they would pay agent fees, in violation of various unfair trade practice laws.[27]

a. New York General Business Law Claims

Plaintiffs allege that Chase's and Signature's refusal to pay them agent fees violates New York General Business Law § 349(a).[28] That statute provides, "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

As a threshold matter, to state a claim under § 349, "the transaction in which the consumer is deceived must occur in New York." Goshen v. Mutual Life Ins. Co of N.Y., 98 N.Y.2d 314, 324 (2002). Once statutory standing is established, a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result. Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009). "Deceptive acts are defined

---

[27]   Fahmia brings a claim against Union Bank under California's Unfair Competition Law. See Union Compl. ¶¶ 75-81. Because the Court dismisses Fahmia's claims against Union for lack of subject matter jurisdiction, the Court does not address this claim.

[28]   Fahmia also brings a § 349 claim against Citi. Because the Court dismisses Fahmia's claims against Citi for lack of subject matter jurisdiction, the Court does not address this claim.

objectively as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." Id.

### i. Claims Against Chase

Plaintiffs allege that Chase engaged in "deceptive acts and practices in the form of misrepresentations on their websites." Quinn Compl. ¶ 95. Specifically, plaintiffs point to language on Chase's website on its "CARES Act FAQ" page, which reads: "[i]f an agent assists the borrower, the lender will compensate the agent out of the fee it receives from the SBA, at a rate of 0.25%-1% of the loan amount, depending on size." Id.[29] Upon request of payment from Chase, however, they were told that Chase had a "system-wide refusal to pay any agent fees owed as a result of agents' work in assisting clients in obtaining loans." Id.

Even assuming that plaintiffs have adequately alleged statutory standing and that Chase's statements were materially misleading, these claims fail for two independent reasons. First, plaintiffs have not adequately alleged that they relied on Chase's representations in deciding to assist their clients with the loan applications. As mentioned above, to succeed under § 349, a plaintiff must allege that it was injured as a result

---

[29]   In deciding a motion to dismiss, the Court can consider documents incorporated by reference in the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)

of defendant's deceptive acts or practices. Spagnola, 574 F.3d at 74. Here, no plaintiff alleges that that plaintiff even saw, much less relied on, Chase's statement that it would pay agent fees. And "[i]f the plaintiff did not see any of these statements, they could not have been the cause of [its] injury, there being no connection between the deceptive act and the plaintiff's injury." Gale v. Int'l Bus. Machs. Corp., 9 A.D.3d 446, 447 (2d Dep't 2004) ("Although the plaintiff cites particular misleading statements by IBM regarding the reliability of the [product], he nowhere states in his complaint that he saw any of these statements before he purchased or came into possession of [the product].").

In response, plaintiffs suggest that traditional showings of reliance are not required under § 349. Pls' Mem. at 28. To that end, they cite to Pelman ex rel. Pelman v. McDonald's Corp., 396 F. Supp. 439, 444 (S.D.N.Y. 2005) for the proposition that plaintiffs "need not confirm that each plaintiff saw or heard each advertisement [in question]." But Pelman made clear that plaintiffs must still allege that they were at least "aware of the . . . schemes they allege to have been deceptive." Id. at 446. Here, because no plaintiff has alleged that that plaintiff was aware of the statement on Chase's website at the time they decided to assist their clients, no plaintiff has alleged that

that plaintiff was injured as a result of Chase's allegedly misleading statement.

Second, the allegedly misleading statement – here, Chase's allegedly representing on their website that they would pay agent fees – is not "consumer-oriented." As mentioned above, plaintiffs bringing suit under § 349 must "charge conduct of the defendant that is consumer-oriented." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995). "The test is not whether a particular plaintiff is an individual consumer," but "[r]ather, the test is whether the acts or practices have a broader impact on consumers at large, where a consumer is one who purchases goods and services for personal, family or household use." In re Libor-Based Fin. Instr. Antitrust Litig., No. 11 MDL 2262 NRB, 2015 WL 4634541, at *8 (S.D.N.Y. Aug. 4, 2015). As a result, "[b]usiness-to-business transactions . . . do not typically give rise to section 349 claims." Id.

Defendants contend that PPP loans are clearly "business-to-business transactions." Defs' Mem. at 11. Plaintiffs respond that Chase's misrepresentations affected "thousands of PPP agents" and that the deception had a "broader impact on consumers and the public interest in New York since the agency fees . . . are paid directly from the income taxes of New Yorkers." Pls' Mem. at 27. But even the cases plaintiffs rely on

involve actions that threaten to harm consumers. See, e.g., Oswego, 85 N.Y.2d 20 at 26-27 (holding that a pension fund sufficiently alleged consumer-oriented conduct against a bank where the bank used "standard documents presented to customers upon the opening of accounts [and] [t]he account openings were not unique to these two parties"). Here, by contrast, plaintiffs do not allege that the public was harmed in any way by Chase's actions; and the mere fact that taxpayers are vaguely implicated in a transaction is insufficient to render the misrepresentation "consumer-oriented."

### ii. Claims Against Signature

Quinn also brings a § 349 claim against Signature. Signature Compl. § 78-86. The only "deceptive act or practices" that Quinn alleges in his complaint, however, is the above-discussed statement, which is found not on Signature's website but on Chase's. See id. ¶ 18, n.13. To the extent the allegation is not the result of a drafting mistake, it is plainly not a "materially misleading" act that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." Spagnola, 574 F.3d at 74.

In his opposition papers, Quinn points to other instances of Signature's allegedly misleading conduct, including, for example, Signature's failure to affirmatively inform borrowers and agents that it would not pay agent fees in the absence of an

agreement. <u>See</u> Plaintiff James Quinn's Memorandum of Law in
Opposition to Signature Bank's Supplemental Memorandum in
Support of its Motion to Dismiss, 20-cv-4144, Dkt. No. 44, at 4-
5. Even assuming <u>arguendo</u> such conduct were misleading,
nevertheless, as discussed above, misrepresentations as to
whether Signature would pay agent fees in connection with a PPP
loan are not "consumer-oriented" and therefore do not fall
within the ambit of § 349.

b. <u>Nevada Deceptive Trade Practices Act</u>
<u>Claim</u>

Tax Divas brings a claim under the Nevada Deceptive Trade
Practices Act (the "NDTPA") against Chase. Tax Divas Compl. ¶¶
139-148. The NDTPA is enforceable by "victim[s] of consumer
fraud." Nev. Rev. Stat. § 41.600(1). To state a claim under the
NDTPA, a plaintiff must establish: (1) "an act of consumer fraud
by the defendant"; (2) causation, and (3) damages. <u>Bertsch v.</u>
<u>Discover Financial Services</u>, No. 2:18-cv-00290-GMN, 2020 WL
1170212, at *5 (D. Nev. Mar. 11, 2020). As used in that section
"consumer fraud" is defined to include: (1) "knowingly mak[ing]
a false representation in a transaction" and (2) "knowingly
misrepresent[ing] the legal rights, obligations or remedies of a
party to a transaction." Nev. Rev. Stat. §§ 598.0915(15),
598.092(8).

36

Tax Divas alleges that Chase "engaged in deceptive acts and practices in the form of misrepresentations on their websites, that they were processing the applications submitted in conformity with PPP rules and according to SBA guidance — including the obligation to pay Agent Fees," and that Chase "knew or should have known that their acts, practices, statements, policies, correspondence, and representations were likely to deceive and mislead Plaintiffs." Tax Divas Compl. ¶¶ 143, 144.

Like the above-discussed GBL claims, Tax Divas' NDTPA claims fail because it has not alleged causation. To plead causation under the NDTPA, "a plaintiff must allege that they reasonably relied on the alleged misrepresentation . . . ." Sylver v. Exec. Jet Mgmt., No. 2:10-cv-01028-RLH, 2011 WL 9329, at *3 (D. Nev. Jan. 3, 2011). Here, Tax Divas does not allege that it relied on – or even saw – Chase's alleged misrepresentation before deciding to assist its clients with their loan applications. In response, Tax Divas suggests that the Court could "infer" reliance from Tax Divas conduct because Tax Divas would not have assisted clients if it did not believe that Chase would pay agent fees. Pls' Mem. at 33.[30] But even if

---

[30]    Tax Divas cites to Gaming v. Trustwave Holdings, Inc., No. 2:15-cv-02464-GMN, 2016 WL 5799300 (D. Nev. Sept. 30, 2016), for the proposition that a court can infer reliance from the plaintiff's conduct. Pls' Mem. at 33. But the court in Gaming

Tax Divas believed that Chase would pay agent fees, it has not alleged that it came to that belief on the basis of some misrepresentation on the part of Chase. Absent such an allegation, the Court holds, Tax Divas' NDTPA claim fails for lack of reliance.[31]

III.   Conclusion

For the reasons set forth above, the Court grants Citi's and Union's 12(b)(1) motions to dismiss Fahmia's claims for lack of subject matter jurisdiction and grants Chase's and Signature's 12(b)(6) motions to dismiss for failure to state a claim. The Clerk is directed to enter judgment in favor of defendants.


SO ORDERED.

Dated:      New York, NY
            September  21, 2020              _____
                                             JED S. RAKOFF, U.S.D.J.

_____

did not make any inference; rather, the plaintiff pled that the defendant made certain misrepresentations directly to the plaintiff. Id. at *7. Here, by contrast, Tax Divas has not alleged that it was aware of the alleged misrepresentation on Chase's website.

[31]   The parties also dispute: (1) whether Tax Divas' allegations meet the heightened Rule 9(b) pleading standard; and (2) whether the alleged misrepresentations involves "consumer fraud," as construed in the NDTPA. See Chase & Citi Supp. at 2-5; Pls' Mem. at 31-33. Because the Court holds that the claim fails for lack of reliance, the Court does not reach these issues.